IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GABRIEL COTTET and KATIE COTTET,

                Plaintiffs,

v.

COUNTRY MUTUAL INSURANCE COMPANY,

                Defendant.

3:16-CV-2038-PK

OPINION AND ORDER

PAPAK, Magistrate Judge:

       Plaintiffs Gabriel Cottet ("Gabriel") and Katie Cottet ("Katie" and, collectively with Gabriel, the "Cottets") filed this action against their insurer, defendant Country Mutual Insurance Company ("CMI") in the Multnomah County Circuit Court on October 3, 2016. CMI removed plaintiffs' action to this court effective October 26, 2016, on the asserted basis of diversity jurisdiction.

Page 1 - OPINION AND ORDER

By and through their complaint, plaintiffs (each, a citizen of Oregon) allege that CMI (a corporation organized under the laws of the State of Illinois and headquartered in Illinois) issued them a homeowners insurance policy (the "Policy") pursuant to which CMI was obliged to provide coverage for damage to plaintiffs' home (the "insured premises") and for damage to plaintiffs' personal property, whether or not such property was located within the insured premises at the time the damage occurred. Plaintiffs further allege that, in November 2015, a fire destroyed a garage located on a parcel of land owned by plaintiffs but separate from and adjoining the insured premises. At the time the fire occurred, the garage contained a large custom-built kiln which was also damaged by the fire. The parties agree that the value of the kiln exceeded the limits of coverage under the Policy. The parties further agree that CMI has paid all amounts due and owing under the Policy for damage to plaintiffs' personal property damaged in the fire other than damage to the kiln, and that the damage to the kiln is covered under the Policy if the kiln is properly characterized as plaintiffs' *personal property*, but not if the kiln is properly characterized as a *fixture* of the damaged garage. Thus, the parties' sole dispute is as to the proper characterization of the kiln either as personal property or as a fixture.

Arising out of the foregoing, plaintiffs allege CMI's liability under Oregon common law for breach of contract and for breach of the implied covenant of good faith and fair dealing, and seek damages in the approximate amount of $260,000, plus pre- and post-judgment interest, attorney fees, and costs. This court has diversity jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1332, based on the complete diversity of the parties and the amount in controversy.

Now before the court are plaintiffs' motion (#10) for summary judgment and CMI's cross-motion (#16) for summary judgment. I have considered the motions, oral argument on behalf of

Page 2 - OPINION AND ORDER

the parties, and all of the pleadings and papers on file. For the reasons set forth below, plaintiffs' motion (#10) for summary judgment is denied, and CMI's motion (#16) for summary judgment is granted.

## LEGAL STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party taking the position that a material fact either "cannot be or is genuinely disputed" must support that position either by citation to specific evidence of record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

Page 3 - OPINION AND ORDER

On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the other. *See* Fed. R. Civ. P. 56; *see also, e.g., Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). A court may not grant summary judgment where the court finds unresolved issues of material fact, even where the parties allege the absence of any material disputed facts. *See id.*

## FACTUAL BACKGROUND

### I. The Parties

Plaintiffs the Cottets are individual citizens of Oregon. Defendant CMI is a corporation organized under the laws of the State of Illinois and headquartered in Illinois. CMI is engaged in the business of providing insurance, including homeowners insurance.

### II. Material Facts[1]

In 1978, plaintiff Gabriel's father, Joel Cottet ("Joel") owned two adjacent lots in NW Portland, Oregon. *See* Declaration (#14) of Gabe Cottet ("Cottet Decl."), ¶¶ 2-3; Declaration (#13) of Mark Lewis ("Lewis Decl."), ¶¶ 3, 5, 6. Joel's residence was located on one of the two lots (now, the insured premises) and he kept a brick pottery kiln of approximately 128 cubic feet in volume in a garage located on the second of the two lots (the "adjoining lot"). *See* Lewis Decl., ¶ 5.

In or around 1979, Joel moved the brick pottery kiln from the garage on the adjoining lot to another property he owned, and replaced it with a significantly larger pottery kiln –

---

[1] Except where otherwise indicated, the following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.

approximately 1000 cubic feet in volume – that he personally had helped to design. *See id.*, ¶ 7. Cottet Decl., ¶ 3. In order to fit the new kiln onto the adjoining lot, it was necessary for Joel to pour a new, additional 25'x25' concrete pad for the existing garage, and then to build new walls and a roof to enclose the newly added pad and the custom-build kiln. *See* Lewis Decl., ¶ 8. The new concrete slab was equipped with a trench intended to be used as a flue for a large downdraft-style kiln like the one Joel had designed. *See* Declaration (#17) of Daniel E. Thenell ("Thenell Decl. I"), ¶ 8, Exh. 4 (Deposition of Gabriel Cottet ("Cottet Depo.")), 38:20 – 39:2, 43:11-17. That flue was connected to a chimney of loose-stacked, unmortared bricks. *See* Declaration (#12) of Robert Graydon ("Graydon Decl."), ¶¶ 8, 12. The main structure of the kiln was made of six solid metal plates approximately 10'x10' in area which were welded together with short seam welds each of a few inches in length. *See id.*, ¶ 8. The metal plates were surrounded by metal piping that could be detatched by unscrewing four connectors. *See id.* The interior of the kiln was lined with flame-retardant fiber. *See id.* The kiln was attached to its power supply with wire nut screws, and attached to the gas utility line with a union joint. *See id.*, ¶¶ 8-9. The kiln was equipped with "pick points" to allow it to be moved by crane while fully assembled. *See* Lewis Decl., ¶ 13. In connection with the new construction needed to accommodate the new kiln, Joel applied for and received from the county a permit to build a "kiln shed." *See* Thenell Decl. I, Exh. 1 ("Application for Building Permit").

Plaintiffs offer Gabriel's testimony that, prior to his death, Joel "often" talked to Gabriel "about his plan and intention to re-locate the kiln to Chehalis, Washington, in order to set up a pottery studio on property that he owned there." Cottet Depo., ¶ 11. Plaintiffs further offer Gabriel's testimony that his father "often 'bragged'" that the kiln had been "specifically designed

Page 5 - OPINION AND ORDER

. . . to be movable so he would be able to move it to Washington and set up his 'dream studio'" there. *Id.*, ¶ 12. Plaintiffs further offer the testimony of Joel's former apprentice, Mark Lewis, that the kiln was designed to be moved, and that Joel joked with Lewis that "'when we move it later [Lewis] can take it apart.'" Lewis Decl., ¶¶ 9-10. Plaintiffs further offer the testimony of another of Joel's former apprentices, Robert Graydon, that in 1979 or 1980 Joel told him the kiln would have to be moved in response to a neighbor's land-use complaint, although it does not appear that the kiln was ever moved in response to that complaint. *See* Graydon Decl., ¶ 20.

In or around 2001, Joel died, and Gabriel inherited both the insured premises and the adjoining lot with the garage and kiln. *See* Cottet Decl., ¶ 2. Following Joel's death, two community colleges approached Gabriel regarding the kiln, and he offered to donate it to one of the colleges, but ultimately the contemplated donation did not occur and the kiln remained on site in the garage on the adjoining lot. *See id.*, ¶ 14.

In 2011, Graydon signed a writing stating in full as follows:

> I Robert Gradon [*sic*] owe Gabe Cottet $12000.00 for the purchase of ceramic equipment. I will pay as soon as possible, no later than two years.

Cottet Decl., ¶ 15, Exh. 1 ("Purchase Agreement").[2] The Purchase Agreement is dated February 2, 2011, and bears the signature of a witness. *See id.* Gabriel testifies that the Purchase Agreement memorialized a contract pursuant to which he agreed to sell the kiln to Graydon, who intended to move the kiln to his own studio in Bend, Oregon. *See id.*, ¶ 15. Notwithstanding the foregoing, Graydon did not move or otherwise take possession of the kiln at any time in or around the period from 2011-2013, and it is undisputed that Graydon never paid Gabriel any

---

[2] Graydon's name is mis-spelled both in the text of the writing and in its signature block, but is spelled correctly in the signature. *See id.*

Page 6 - OPINION AND ORDER

amount of money in connection with the transaction referenced in the Purchase Agreement. *See* Cottet Depo., 46:24 – 47:6.

CMI issued the Policy to the plaintiffs on December 7, 2014. *See* Declaration (#17) of Daniel E. Thenell ("Thenell Decl. I"), Exh. 2 (the Policy) at 3. The Policy provided coverage for damage to the insured premises, and additionally provided coverage for damage to plaintiffs' personal property located anywhere in the world. *See* Policy at 2-16. The coverage limit for such damage was $283,719.00, and the effective period of the policy was from December 7, 2014, through December 7, 2015. *See id.*

In 2015, during the effective period of the Policy, an accidental fire occurred in the garage on the adjoining lot, causing damage to the garage and its contents, including the kiln. *See* Cottet Decl., ¶ 4. It is undisputed that CMI paid the Cottets Policy benefits for all damage to the garage itself, but declined to pay any Policy benefits for damage to the kiln itself.

In May 2017, Graydon moved the kiln to his Bend studio. *See* Graydon Decl., ¶ 19. He lifted the kiln out of the remains of the garage using a crane and the kiln's pick points, and placed it fully assembled on a flat-bed truck in order to move it. *See id.* It was unnecessary to disassemble the kiln or the garage before moving it, because the fire had burned the roof off of the garage. *See id.*

## ANALYSIS

As noted above, the parties' sole dispute is as to the proper characterization of the kiln as a fixture of the garage on the adjoining lot or as personal property of the Cottets. It is the Cottets' position that the kiln is personal property, such that the damage it suffered in the 2015 fire is covered under the policy, whereas it is CMI's position that the kiln is properly characterized as a

fixture outside the scope of Policy coverage.

As a preliminary matter, I note that it is the Cottets who bear the burden of proof on this question. Under Oregon law, it is the burden of the insured in an insurance dispute to prove coverage, and the burden of the insurer to prove the applicability of an exclusion from coverage. *See FountainCourt Homeowners' Ass'n v. FountainCourt Dev., LLC*, 360 Or. 341, 360 (2016), *quoting ZRZ Realty Co. v. Beneficial Fire & Cas. Ins. Co.*, 349 Or. 117, 127 (2010). For purposes of this determination, the Oregon courts distinguish between questions relating to *limitations on coverage*, which they treat as "coverage" questions, and questions relating to *exclusions from coverage*, which they treat as "exclusion" questions. *See ZRZ*, 349 Or. at 127, 127-133. Moreover, the Oregon courts recognize that there may be no difference in the rights and obligations of the parties to an insurance policy providing broad coverage subject to exclusions versus those of the parties to an insurance policy providing limited coverage subject to no exclusions, and treat the choice of the drafter of an insurance policy to characterize a restriction on coverage as a *limitation* or as an *exclusion* as controlling for purposes of the burden-allocation issue. *See id.* at 133. Here, the Policy restriction that treats damage to fixtures as covered losses only where the fixtures are fixtures of the insured property itself is characterized as a limitation on coverage rather than as an exclusion from a broad grant of coverage. In consequence, under ZRZ it is the burden of the Cottets to prove that the kiln was personal property, and not the burden of CMI to prove that the kiln was a fixture of the garage on the adjoining lot.

It is well settled that the Oregon courts apply a three-part balancing test to determine whether an article on land is personal property or a fixture more properly considered part of the

Page 8 - OPINION AND ORDER

real property:

> (1) real or constructive annexation of the article to the realty; (2) appropriation or adaptation to the use or purposes of the realty with which it is connected; (3) the intention to make the annexation permanent.

*Johnson v. Hicks*, 51 Or. App. 667, 672 (1981), *quoting First State & Sav. Bank v. Oliver*, 101 Or. 42, 48 (1921). "The intention of making the article permanently accessory to the real property is to be inferred from the nature of the article, the relation of the party making or maintaining the annexation, the policy of the law in relation thereto, the structure and mode of annexation, and the purpose and use for which it is made." *Id., quoting First State*, 101 Or. at 49. "The controlling intention is that which the law deduces from all of the circumstances of the installation of the article upon the land." *First State*, 101 Or. at 50.

However, where an article is so fully attached to real property that it cannot readily be severed therefrom without damage either to the article or the property (or both), the article is a fixture of the real property as a matter of law:

> This [three-part balancing test] is without application, however, where, by reason of the manner of annexation, the chattel loses its identity or distinctive character as such, and becomes so inseparably a part of the freehold as that it can not be detached without material injury thereto, or without substantial impairment of the value of the chattel,--such as the brick or timber contained in the walls of a building, or the stones of a foundation upon which the structure is erected.

*Alberson v. Elk Creek Mining Co.*, 39 Or. 552, 559 (1901).

Because the facts underlying the parties' conflict are not in dispute, it is appropriate for this court to resolve the issue as a matter of law, notwithstanding that, in general, "the problem of whether an article is or is not a fixture is by nature a mixed question of law and fact. . ." *Waldorf v. Elliott*, 214 Or. 437, 441 (1958). The *Waldorf* court applied the three-part balancing test to determine as a matter of law on undisputed ultimate facts that grain tanks or small

Page 9 - OPINION AND ORDER

granaries located on land were fixtures. *See id.*, 441-444. More recently, the Oregon Court of Appeals expressly affirmed that where the objective facts bearing on annexor intention are undisputed (notwithstanding that the annexor's subjective intention was vigorously disputed), it is appropriate for the proper characterization of an article as personal property or as a fixture to be determined as a matter of law by the court:

> The law of fixtures in the United States has generally evolved from the landmark case of *Teaff v. Hewitt*, 1 Ohio St 511, 59 Am Dec 634 (1853), which set forth a threefold test of a fixture. *See*, Brown on Personal Property 698, 700, § 137 (2d ed 1936); Note, 19 Or L Rev 152 (1940). In adopting *Teaff*, our Supreme Court has said that the status of an article of personalty as a fixture depends upon (1) annexation, real or constructive, to the real property; (2) adaptation to the use or purpose of the realty, where, and as attached; and (3) the intention of the annexor to make the item a permanent accession to the freehold. *Helm* et al. *v. Gilroy* et al., 20 Or 517, 522, 26 P 851 (1891); *Alberson v. Mining Co.*, 39 Or 552, 558-59, 65 P 978 (1901). Of the three tests -- annexation, adaptation and intention -- the most important element, which is said to generally be controlling, "at least where there is doubt as to the effect of the other two tests," is the objective intention of the annexor. *Highway Com. v. Feves* et al, 228 Or 273, 278, 365 P2d 97 (1961).
>
> The intention of the annexor can be inferred from "the nature of the article, the relation of the party annexing, the policy of the law in relation thereto, the structure and mode of annexation, and the purpose and use" for which the annexation of the article was made. *Johnson v. Pacific Land Co.*, 84 Or 356, 361, 164 P 564 (1917). Thus the law deduces the controlling intention from all of the circumstances of the annexation. 84 Or at 362.
>
> In this light, **the question of whether an item is a fixture is in essence a mixed question of law and fact.** *Alberson v. Mining Co.*, *supra* at 559; *Johnson v. Pacific Land Co.*, *supra* at 363. However, **under certain circumstances, an article may be determined to be a fixture as a matter of law.** *Masheter v. Boehm*, 37 Ohio St2d 68, 307 NE2d 533 (1974); *Bay State York Co. v. Marvix, Inc.*, 331 Mass 407, 119 NE2d 727, 729 (1954). **This occurs when "the evidence may be so clear that only one conclusion can be drawn therefrom, and in such cases the court will take the matter from the jury and itself decide the case, it being said, perhaps metaphorically, that the question is one of law."** *Brown*, *supra* at 703. *See, e.g., Beebe v. Pioneer Bank & Trust Co.*, 34 Idaho 385, 201 P 717 (1921), where the court held that a vault door in a bank building was a fixture as a matter of law.

Page 10 - OPINION AND ORDER

> "Where, in an appropriation proceeding, there is no substantial
> dispute of material fact concerning the identity, nature and function
> of property for which 'fixture' status is sought, determination of the
> extent of the taking whether an item is an included fixture is a
> question of law to be decided by the court." *Masheter v. Boehm, supra,*
> 307 NE2d at 540; *cf., Kraxberger v. Rogers,* 231 Or 440, 451, 373 P2d
> 647 (1962) (negligence action -- family purpose doctrine); *Unemp.
> Compensation Com. v. Brown,* 225 Or 306, 309, 358 P2d 502 (1960)
> (unemployment insurance).

> The only apparent question presented concerning the fixtures is: What effect does removability and resalability have in determining whether Empire's machinery and equipment are fixtures or personal property? The Commission did not present evidence, nor did it argue, that the machinery and equipment were not attached to the realty -- either bolted to special cement foundations, or bolted and welded to the structure of buildings. Nor did the Commission argue that the machinery was not adapted for use in the production of concrete products. Of primary importance, there was no evidence that Empire, as the annexor, intended its annexation of the machinery and equipment to be anything other than permanent, that is, until the machinery wore out. It is also self-evident that removal of the articles would render the property useless for its intended purpose -- production of concrete products.

> It appears that the three tests of a fixture have been met. *Helm* et al. *v. Gilroy* et al., *supra*; *Alberson v. Mining Co., supra*. The Commission's argument is, however, that the machinery could possibly be removed and resold; hence the items were not fixtures. **The fact that it is possible to remove this machinery by dismantling it was not contested; therefore, on the evidence presented, there was no factual question for the jury to decide. There was only a legal question as to the effect of removability on the question of fixtures.** On this basis the trial judge ruled that the items were fixtures because they were attached, adapted for use in concrete products production, and affixed with the intention to remain permanently in place, regardless of possible removability or resalability.

*State by State Highway Com. v. Empire Bldg. Material Co.,* 17 Or. App. 616, 625-628 (1974) (emphasis supplied. modifications omitted). The *State by State* court expressly affirmed that "[b]ecause there was no dispute as to the essential facts concerning the attachment, adaptation and intention of the annexor in this case, the question was properly a question of law for the trial court." *State by State,* 17 Or. App. at 634.

Here, the undisputed objective indicia of Joel's intent[3] present a close question of law. I agree with the Cottets that some of those indicia militate in favor of finding that the kiln was not intended to be permanently annexed to the garage on the adjoining lot, such that could properly be characterizable as personal property, including that it was constructed with pick points to permit it to be moved while fully assembled, that a permanent, mortared chimney was never built for it, that its points of attachment to the garage were minor and designed for easy detachment, and that it was designed such that it could be disassembled and later reassembled. However, I agree with CMI that other indicia militate against that finding, including that the garage was modified expressly and solely to accommodate the kiln, specifically through the construction of a new concrete pad, new walls, and a trench in the concrete floor with no evident functionality other than to serve as the flue for a large downdraft-style kiln like the one Joel had designed, and that to have moved the kiln prior to the destruction of the garage roof, it would have been necessary either to remove the garage roof in order to lift the kiln out of the garage with a crane or to grind through multiple seam welds, to move the kiln in parts, and then to reassemble the kiln and recreate new seam welds in the new location. The fact that the adaptations to the garage would be rendered pointless by removal of the kiln (unless it were replaced by a substantially similar kiln), and the fact that disassembly of the kiln would necessarily impair its value (in that nontrivial labor costs would be required in order both to grind through its seam welds and to disassemble it and also to reassemble and re-weld it) both militate heavily in favor of the finding that the kiln was a fixture of the garage.

---

[3] I construe the Cottets' proffered evidence as to Joel's subjective intention one day to transport the kiln to a new location as immaterial to the question of determining annexor intent from the objective circumstances of the installation.

Page 12 - OPINION AND ORDER

As noted above, it is the Cottets' burden to establish that the kiln was personal property. In determining whether the Cottets have met that burden for purposes of their own motion for summary judgment, I view the evidence of record in the light most favorable to CMI, and resolve any disputes of fact, if any, in CMI's favor; in determining whether the Cottets have met their burden for purposes of CMI's motion, I view the evidence of record in the light most favorable to the Cottets, and resolve disputes of fact, if any, in their favor. Because the objective indicia of the annexor's intent are undisputed, there are no disputes of fact to resolve, and whether viewed in the light most favorable to CMI or to the Cottets, I cannot find that the Cottets have met their burden by a preponderance of the evidence. In consequence of the Cottets' failure to meet their burden by a preponderance of the evidence, I find for purposes of resolving both motions now before the court that the kiln was a fixture of the garage on the adjoining lot. It follows that damage to the kiln was not a covered loss under the Policy, and that CMI is entitled to summary judgment in its favor in connection with both of the Cottets' claims against it.[4]

## CONCLUSION

For the reasons set forth above, the Cottets' motion (#10) for summary judgment is

///

///

///

///

///

---

[4] In light of that disposition, I need not address CMI's alternative argument that Oregon law does not recognize a cause of action for violation of the implied covenant of good faith and fair dealing under circumstances such as those at issue here.

Page 13 - OPINION AND ORDER

denied, CMI's motion (#16) for summary judgment is granted, and summary judgment is entered in CMI's favor as to the Cottets' claims against it. A final judgment will be prepared.

Dated this 9th day of November, 2017.

/s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge

Page 14 - OPINION AND ORDER